I don't know if you can see us or not. Oh, that's good news. That's good news. Better that you say that than I say that. Good morning. As you can see, Deborah is joining us by video conference. This is the matter of Stump v. Richland Township. Mr. White, should I proceed? Yes, sir. Okay. As is apparent from the timer, I'm Charles White. I represent Jeff Stump, the appellant, the plaintiff in the trial court. I requested three minutes of rebuttal. Okay. Maybe you can help me out with this. I guess it's a July 27th conversation that he had. It's June 27th. And then it's June 29th, which is the second conversation. Okay. And the district court seemed to look at what happened from your client's deposition and conclude from that that your client was basically trying to hold up, if you will, the township by saying, look, either you give me count time and back time and whatever it was, vacation pay, or I'm going to go public with this. Am I incorrect in saying that that first June 27 meeting, which is a private one-on-one with him and Orfani, or Studi, I guess it is? I'm sorry. The first conversation on June 27th was just my client and Supervisor Orloff. Right. And then there's one two days later, which is one-on-one. Yes, with Supervisor Tambori. That was actually initiated by Supervisor Tambori and not my client. Okay. Because he was told in the first meeting not to discuss the meeting. And the crux to that was basically him trying to say, well, I don't mind going back to my prior position, but there's these concerns I have and you've got to satisfy me that these concerns are being addressed before I go back to this prior position. Well, which conversation are we talking about? The first one? Both. In the first conversation on June 27th, the conversation dealing with the speech at issue, to use that phrase, dealt with my client's concerns about what he had come to perceive after looking at the issue for several months and having raised it earlier. Go ahead, Judge Berry. I'm sorry, Judge Berry. I really can't hear. Was that the conversation in which he said he wanted to handle it in-house and not make it public? That's correct. My client's testimony at all times and conduct at all times was that he wanted to handle everything in-house. He wanted to keep it internal. He did not want it to go public. He was concerned that the supervisors might bury it under the rug and mention the possibility of going public if that was necessary but hoped that he wouldn't and never did, as a matter of fact, thereafter. But the bottom of your question is yes, Judge Berry. As to the conversation on June 27th with Supervisor Orloff, the issue that you raised about when money arose, that was not on June 27th. That was on June 29th, two days later, when Supervisor Orloff came to my client who had not intended to go to Supervisor Orloff and after reviewing the same speech, if you will, that had occurred on June 27th, my client on June 29th, the subject of my client's possible resignation came up. This was subsequent to the speech that we're here for. And in the context, as I made clear in my reply brief, in the context of the discussion of possible resignation, not in relation to the speech issues, the issue of my client's request that if he resigned he would want to be paid for everything he's owed came up, which was entirely natural and proper in our view and had nothing to do with the speech at issue. We didn't tie money demands to the issues that arose with regard to the speech at issue. Well, that seemed to be the District Court's conclusion, I guess, based upon your client's deposition. Frankly, that's not the way I read that deposition at all. Well, you and I are agreeing on that particular point. You're simply saying if you want me to resign, okay, but I want to make certain that I get the wages I'm entitled to get before resigning. I've got these concerns that want to be resolved. Yes, in the appellee's brief they tried to make it look like my client was tying personal, quote, demands, end quote, to the issues that we're here for. And that is absolutely not the case. It did not even come up in the first conversation with Orloff. I know, as I said, only as a secondary matter when raised in the second conversation, when the possibility of my client's voluntary resignation came up. I make this very clear in my reply brief that the issue of monetary demands is completely unrelated or requests is unrelated to any of the speeches. Mr. Weiss, define for me a little better the exact speech, which was a public concern, that he indicated to the two supervisors in the June 27th and June 29th conversations that he was prepared to make public. What was that speech? What was it about? The subject matter? Yes. The subject matter of the speech dealt with two township practices that he had first observed in March. He was hired as a full-time employee in the township after working for the township for years. I understand that. In other capacities in February of 2000. By March, he had seen the first issue was he had seen the supervisors meeting in private and discussing. He had attended a couple of these meetings and discussing township business, township affairs, discussing how they were going to vote in upcoming meetings, discussing the issues of these There's a provision in the Pennsylvania Sunshine Law for executive committee meetings. These were not executive committee meetings. That's what Mr. Stumpf was elected. But you acknowledge there is provision in the Sunshine Law to have discussions so long as they're not a public vote taken relative pursuant to the executive committee exception. Right. The problem was these were Remember, my client's dealing He's not a lawyer. He's dealing from the standpoint of either a national violation or a potential violation at that point. Okay. But you do acknowledge there's an executive committee exception under the Pennsylvania Sunshine Law. Well, the law speaks. Yes, the law speaks for itself. But what I'm saying to you, Judge Fischer, is that my client's observations were they went way beyond Okay. What was the second thing that he was concerned about? In addition to potential or actual Sunshine Law violations? Correct. The fact that the township was soliciting and really coercing donations from developers in order to get approval for projects. And these were not donations or contributions to the supervisors themselves. No, no. They were donations that under the Municipalities Planning Code Voluntary donations or contributions are allowed, but not certain instances for recreation, transportation, and both of which require ordinances to be adopted, which were not adopted by the township. The Municipalities Planning Code prohibits coerced donations. They have to be truly voluntary. And that's what's taken care of. Yes. I thought it was fair to call it either illegal or illegal to operate on campus. Yes, in violation of the Municipalities Planning Code. Now, is it just the code or was it? Well, he's not a lawyer. He wouldn't know the difference. When I read that, I thought more state law bribery than in violation of the Planning Code. In fact, under the conditional use provisions of the Municipalities Planning Code, one of the permissible conditions that could be included in a subdivision plan would be that there would be a requirement for a contribution for a particular municipal purpose such as the payment for the installation of a traffic light at an intersection that may be necessitated by the development. Right, but that relates to a specific cost of the development. Related to the development, what was happening here was donations were arbitrarily set. The meetings, they discussed the donations, what they called donations, at these meetings. They arranged the meetings with the developers to demand the donations immediately prior to the public meeting. Donations to what? Donations of money. The money was deposited. It didn't go to the court. Where was the money? My client's testimony was that Supervisor Orloff told them that the money was being put into the general fund and they needed it for the police department. These are clearly not anything permitted by the Municipalities Planning Code. And were these contributions that were not going to be specifically conditions and a conditional use approval? Yes. The money was my client was told that the money was for the police department and was actually, when received, deposited into the general fund. How much money were you talking about? I'm sorry, go ahead. Let's take to particular value for the test. Do you agree that our case in a lot of ways is somewhat confusing? I think it clearly was a recalcitrant case according to the rules of the case and the decision that the city has done their part to contain the non-recalcitrant case. But I think it seems a little strange, don't you? In terms of whether or not the balancing test is applicable? Well, I believe it is not the balancing test. I think there are more issues to be agreed upon in the case. Well, the Township's position in this case is clearly that they did not concede or admit that there was any connection between the speech and the discharge. And, in fact, they took the position that is clearly evidenced on the record in several areas that the discharge was solely due to poor work performance. But they worked with the non-recalcitrant in that law? I think under the controlling case law from this Court, Pickering does not apply in that instance, yes. In which instance? In the instance where the defendants take the position that the discharge is not causally related to the speech at issue. And that's why I ask the question. Because, indeed, we know that the analysis of the application has never been given into the ground, taking such as that Zarek and Collins and I have done about it, that even in this situation, there is no claim to be made in the case. I didn't believe Zarek to have undertaken any balancing at all. Zarek was a Title 7 case, which discussed the issue of causation, never mentioned San Filippo in one way or the other. Pardon me? I couldn't understand. She withdrew. She withdrew the question. Well, this is here on summary judgment. In trying to get a handle on this is difficult, because I just said in most of these cases, there's no issue about why the person was terminated and then you get into whether or not Pickering applies and if it applies. Correct. Here, if the stated justification is time management and there was a second word. There's several reasons given, but they all add up to unsatisfactory work performance. Nothing about alleged disruption, nothing about the speech, at least in the documents and the admissions we have of record. So there's nothing balanced on the if we were to get to Pickering, we have to take the allegations as stated in the complaint, given the stage of proceedings. There's nothing balanced. We're not talking about whether or not the level of disruption justifies the discharge. Our position is that under San Filippo and the Howard v. Board of Education case in this court, not to mention the inferences from Pickering and other cases in that line, that if the township is going to take the position that the speech was not a factor in the discharge or the alleged disruption from the speech, or if there is even a factual issue on that point for some of the judges, then the balancing test doesn't apply because it becomes irrelevant to the case. So you're letting me know that he's trying to retaliate for his suggestion that what was happening was illegal and that it might be necessary for him to force himself to engage his purposes. That was why he was fighting. Let me make it clear. The issue of ultimate causation is not before your honors. That wasn't raised as a reason for some of the judges one way or the other. The only issue raised was the balancing test. The first issue on this record is whether that test even applies under San Filippo and Howard. I can't hear you. Maybe it's my hearing too. That's the issue. The issue is the act of using a non-consensual purpose of some of the judges that required the testimony of speech. I don't know if you can give me a record of that. There's no such concession. I'm sorry. There's no such concession on the record. The concept of a concession deals with the requirement that it be in the record as a factual concession. There's no concession anywhere. The only thing we have in this case, and this is addressed in the public speech and the reply brief, your honor. The only concession that allegedly... I'm saying there was a valid concession. I'm saying they did concede because of some of the... But they did not. They did not concede. Some of it was already denied. They have not stated they conceded. Even if they could concede solely as a strategic reason for appeal purposes and there's nothing of record to indicate they conceded as a factual matter, they have not conceded. I addressed this in my reply brief. They tried to allude to a concession by referencing merely the standard of review on summary judgment, that the record and the facts and inferences must be viewed in a light favorable to the non-moving, meaning plaintiff in this case. That's the alleged concession. They also made the statement that we acknowledge such a concession, but in doing that, I set forth in my reply brief, you'll see that they twisted a statement from our brief to make it look like we conceded, we acknowledged their concession, when in reality if you look at the full quote from our brief that was twisted by the appellate by not repeating the full quote in their appellate's brief, you will see that all we did was acknowledge an agreement as to what speech was at issue in this case. So it's a fundamental distinction but an important one. At no time was there a concession. If there was a concession, then why are we even you know, the bottom line is that there was a concession, that there was a causal, they don't want to make that concession because they want to argue the causation issue. Aren't you raising that for the first time in your reply brief? It's only in response to which, your honor? The fact that he was not dismissed because of the speech. I mean, you didn't raise that for a lot of them. Yeah, the issue that he was not dismissed because of that issue was made clear. That's a new point. But that was not before the court of summary judgment. But the fact that the issue of performance versus Correct. Yes, that's clearly a record and clearly part of It seems to me you're coming in on the reply brief with the argument now that goes back to your complaint as opposed to the argument that was before the court of summary judgment. It doesn't go back to the complaint. The complaint's not even referenced. The reply brief only deals with responding to the appellee's assertion that there had been some type of concession by them or admission by us that they conceded in the lower court. The reply brief was only to respond to those assertions in the appellee's brief. The issue of performance as the sole factor cited as the reason for the discharge in the lower court was clearly a record and clearly part of the summary judgment briefing and argument. Well, there was no argument, but briefing and the record itself. Do you reserve some time, I think, for a vote? Yes, I reserve three minutes. Okay, thank you. Mr. Chairman? Good morning, Your Honors. Frank Trebek for the appellee, Richland Township, Richland Township Public Supervisors, and the individual Supervisors, Richard Orloff, Stephen Tambouri, and Patricia Keller. I'd like to address the San Filippo issue if I could first, which is what the discussion was. San Filippo, the discussion about not being able to raise the balancing test unless there's a concession, that the speech caused the adverse employment action is dicta. San Filippo went on to discuss that case. Much of the case is a discussion about the petition clause versus the right to free speech clause, and the court concludes that a non-chamber petition is protected whether or not it's on a matter of public concern. The court also, with regard to the free speech issue, sent the case back to give the plaintiff more discovery under 56F to develop facts to rebut the employer's position that we would discharge this person notwithstanding the speech, which is the third element of the three-step balancing, three-step analysis under First Amendment. So San Filippo is dicta. The courts that have followed it, in fact, Howard followed it, and said that the district court promptly did not do the balancing test because there was no concession. That's dicta also. I thought I understood the case before I came into the argument. We've got a pretty simple issue with a complaint under a 1983 retaliatory speech case. The district court made a ruling on summary judgment, and the only issue really for us, it seems to me, is whether or not there's a genuine issue of fact. You're saying that the action that your client took had nothing to do with the speech. Is that what you're saying? Factually, that is true. How do we get to summary judgment when the complaint is there and we have to take the complaint as the district court had to, assuming that the complaint as pleaded is accurate? He's alleging he was fired because of speech. Why isn't that an issue of fact? How do we get summary judgment on that? That's the second step of the three-step analysis under the First Amendment. That's not the balancing test. That's the causation. Why is there a First Amendment inquiry if, as a matter of fact, he wasn't fired because of speech? Let's assume he was a lousy employee. That's why he was fired. There's no First Amendment issue there, is there? There's a First Amendment issue raised by the plaintiff because they're alleging he was fired for speech. Exactly. That's my point. If there isn't a factional issue, then we have to try to figure out why he was fired. If he was fired for speech, we get into a pickering issue and a balancing issue. If he's not fired for speech, there's no First Amendment protection over his job. Let me back up. The balancing issue is for the first element of the pickering analysis. Why does pickering apply? Because it's First Amendment retaliation. Why is it First Amendment retaliation case? If he didn't fire him for speech, why is that retaliation? He fired him because he was a bad employee. The plaintiff alleges that we fired him for speech and we have conceded that for purposes of summary judgment. There is a question of fact. Can I just say pickering is a matter of whether the speech is protected. Whether the speech is protected is the balancing test. Let's back up a second. To get to this concession, you are conceding for purposes of summary judgment and for purposes of this appeal that he was fired in retaliation for these statements. Is that right? That's in the brief. That's what the Zamboni court did. They said specifically for purposes of summary judgment the defendant has conceded. Let's forget San Felipe. I'm not quite sure how that plays out. Same with Correa. Correa is a recent case against the city of Clareton and for purposes of summary judgment they conceded that the speech caused the adverse employment action while the facts state that it was for another reason. And so why is that? The other... The other reason the defendant is here is that they conceded on April the 11th that the fire hit the 8th street of Clareton building. The other reason they are here is because they are not aware that he was fired from Clareton. Is this a case of their worth? Is it a case of their worth? Well, that's why courts cannot require... The question is when we say he was fired for his poor performance, which we do, that goes to step 2 of the bickering analysis whether the plaintiff can show that the speech was a motivating causative element. That is almost always a question of fact whereas step 1... You're conceding here for purposes of the appeal of the summary judgment that it was. That is an issue. That's causation. That's not an issue here. I just want to try to find out what the issue is. The issue is step 1. The bickering balance is step 1. Step 1 of what? The bickering test. The question is, is it a bickering balance? You're answering by saying it's step 1, but that's a yes. It's a bickering balance. How do you understand why the employer's interest in this disruption, preventing disruption, would trump the public's interest in what I interpreted as being an allegation that the sunshine law was being violated and developers to use a rather crude term were being shaken down against oil permits. How do you get a balance to have disruption trump that when there doesn't seem to be any disruption here? Because when you say there's no disruption in the core world, the chance for potential disruption is so great. What is the potential disruption? Let me ask you this. If you say there is no opportunity for employment services, where the speech disrupts or the potential disrupts any hope of employment activities taking place. If that's the case, wouldn't efficient operations mean an efficient operation of a leader government services? That's true looking at the content of the speech. An employer would be the best work. But then we have to look at what is a right to the facts in the right for a savior or a supporter which a record that the committee is an improper activity. That's one of the factors in determining whether... How can the speech be supposed to rectify that situation when you can see an efficient operation of government services? Well, because you have to look at the context of the speech also and the motivation behind the speech which motivation is always a factor on the speaker. Previously, it couldn't be... Doesn't he have a deposition where the context is a one-on-one conversation on June 27 and a one-on-one conversation on June 29 where he's basically saying, as I interpreted it, that if I design one... I want to make certain that all my pay that is entitled to me I will get and I'm not anxious to resign until these concerns I have are resolved. You're telling me this process is legal. I want to know what makes you think that they're legal and until that's resolved, I'm not comfortable taking another position. That's... And this is some rejection. That's the way I read that. I'm just talking about why this case isn't smack dab on O'Donnell. Why doesn't O'Donnell resolve this? The kind of disruption you're talking about is the kind of disruption we said O'Donnell, we couldn't recognize under a Pickering balance. The... I want to get to the motivation of the speaker because that was important at the lower court and there's four incidents that the plaintiff alleges led to the breakdown of his close working relationship with the supervisors before his alleged protected speech. There's four incidents and the one that occurred immediately before he said something about the Sunshine Act on June 27th was that Orloff accused him of setting up the board with the Department of Environmental Protection showing up at the meeting and called him a liar. Immediately after that is when Mr. Stump raised the Sunshine Act. There were three incidents... He said he had nothing to do with the Department of Environmental Protection. He said that maybe not true but he's saying that wasn't something that he didn't go inside the board with at all. Whether he did or he didn't, we're looking at the month of his speech and he admits... I understand that, Your Honor. I also understand the timing of his speech is important. In the Versages case, for example, the timing of the speech was important. Mr. Orloff says in Versages there was no explanation for delaying the speech. The speech was made after a breakdown with the supervisors.  that I raised it in March. Nothing was done. I studied for the entire month of March. Then I raised it with Mr. Orloff on June 27th. He also admits that one week before June 27th is when he read the pamphlets on the right to know law, the Sunshine Act, and one week before he picked up the new municipal planning code and recognized that he wanted to raise this. He didn't raise it for one week until after... Versages is so different. Versages is a situation where the context made clear this is a petty gripe that this guy had. It may have had some underlying ground to it. It may have been corrected because of some underlying fire code violation or building code violation. But this was basically a petty gripe that was getting some traction because there may be these ethical breaches there on the part of some of the employers. That is not this case. And O'Donnell always said, because when I read it, I thought to myself, maybe we had this in mind. The First Amendment, the balancing test, can hardly be controlled by finding that disruption did occur. An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office. And some of that language is a bit strong for the practices here, but it seems to me that the analysis, nevertheless, is the same. He's alleging that there was no fact to support that the speaker had a personal motive for raising the speech. Whereas here, it is admitted that there was a breakdown in the relationship. He is starting to get worried about his job. And he raises the speech once with the supervisors, either once, three months, or one week after he has the concern. And he only does it after he is demeaned at a Board of Supervisors meeting on June 26th by Supervisors, like Supervisor Orloff. He clearly wasn't happy about how things were going, but I think it was in Pickering where the Supreme Court said, motivation alone is one factor, but that can't be the controlling factor. In fact, my guess is that it would be the very rare employee who, if things were humming along in a swimming way, they were getting all the bonuses they were entitled to, all the promotions they were entitled to, but they knew of some illegality. Most employees would kind of go with the flow with that. It would only be when they had some personal motivation that they would be motivated to upset the apple cart and danger their employment by blowing the whistle. That doesn't necessarily mean that the public has a lesser interest in the nature of the priority and illegality that they're reporting. It simply goes to show why it is that they may have delayed for whatever period of time before they blew the whistle. And I guess all that is to say, I'm not as swayed by the strength of the motivation in the Pickering balance as you seem to be. Well, the motivation is one of the factors. Under Garcetti, it can be a dispositive factor. Now, under a Garcetti case, it's the first factor. It can be, but when a person's talking about illegality, I'm not even sure Garcetti comes into the analysis. Because Garcetti was not a situation where illegality was involved. You could argue it was certainly a major breach of professionalism on the part of the police officer there, but I'm not certain the Supreme Court wants to go so far as to say that if your official duty involves a function, and you, in the course of that official duty, disclose illegality, that you have no protection for that speech. It seems to me that the public has an interest in finding out that there's some illegality, and the fact that it's disclosed in the course of doing something which is part of a person's official duty ought not to allow the employer to come in and just fire that person. I don't think Garcetti said that. As part of the balancing test, isn't the township's interest also part of that test? The township itself, not the supervisors, but the township. Right. And what would have been the township's interest in suppressing information about possible corruption? I don't think the facts support that they suppress the information. I think Mr. Roilof responded to him and said, they have told us these meetings are okay, suggesting that they have already looked into this, and I don't know what he had to say. I don't know. The interest of the township is to continue the efficient operations of the government operations. That's why I just read you the quote from O'Donnell, because O'Donnell said, we said, that can't be the kind of interest that society can accept. You're saying we need to be able to continue and I'm not saying this is what's happening, but I'm getting the allegation and where we are in some of the judgment. You're saying that in order for the township to continue with its efficient operation, it has to be able to continue shaking down developers to fund the police department. That's what you're arguing. I'm not arguing that at all. You just said that. I'm arguing that they have to continue to lawfully apply the zoning policies and the planning commissions, which Mr. Stumpf was responsible for. Mr. Stumpf was at a certain level in the hierarchy doing that. Which lawful effect? He's alleging that you're not lawfully applying the zoning commission policy because that policy includes illegally funding the police department. And we responded to him that we've been told this is okay. They have told us this is okay. I don't know what he's supposed to say. We know it's illegal. We're going to continue. Of course he's going to say, well, we think it's okay. Keep your mouth shut. I don't understand. When someone does this, again, he thinks it's grounded in his speech as being as being as being he's speaking of the zoning and development policies. And that's literally the only explanation that he gives. Literally the only explanation that he gives he is speaking. And I don't get where he is at. He's speaking of the problem. I'm relying on what his deposition testimony says in his speech is basically he complained about having private meetings under the Sunshine Law and getting contributions from developers that he didn't think was right or lawful. I'm not sure he has to illegal in his phrase. Even if he didn't, my position would be that challenging the supervisors directly like that, like in the Grigsby case, leads to more potential disruption. There's another way to handle that. And you don't keep the credibility of your supervisors by saying you're engaged in illegal activities. I think that supports the potential for disruption. Just like Judge and the behavior and the context in which he presented this, coming on the heels of... Isn't there a good disruption of everything going through? Isn't there a good disruption as opposed to a bad disruption? Isn't there a good disruption when you disrupt illegal activities? Is there not? And that's not the kind of disruption that he's talking about. If you disrupt illegal activities, I would agree that's a good disruption. And he said in his deposition, I do remember before I left that I told Rick that I wanted to resolve this. Either if they are illegal actions, we need to get them to stop. If they are not illegal actions, please have it explained to me as to why they're not illegal actions or inappropriate actions. And I'm trying to handle this in-house only so that it does not go aside, it does not go public. I wanted to try and resolve it. And it was an important issue, a public issue, a public trust, and it needed to be resolved. And Versace, the Freud officer, said, I raise these complaints about human violations. Versace was, as I said, a very petty dispute that became incredibly intense. Versace, he said he raised these complaints about human violations. I mean, none of it, none of it is really important. I mean, who are the guys living in the back of the room in the right-hand corner of Versace where you can see Versace? Versace, I mean, there's a property violation that Versace was in contact with so that dispute. Well, that's the second step of the picturing analysis that is in the foreign court. The first step is whether he engaged in speech on a matter of public concern, and the district court ruled that yes, it was a matter of public concern, but it was limited because of the personal motivation and the admitted breakdown. The district court saw that he had a motive to save his job. I just read you what he said. The district court found that. I just read you the deposition. Again, we say it over and over again. This is summary judgment. He wants to get it resolved. Now, you can say that jury defined his motive was to save his job, and he was trying to shake down, as opposed to the township shaking down the developers. You could argue that he was trying to shake down the township, but we're not at that stage. It's an argument you might make to the jury, but that's exactly... ...